Okay, whenever you're ready. Thank you. Good morning. May it please the court. I'm Donald Norris. I'm co-counsel for the plaintiffs and appellants. While this case involves some As to the issue before this court now, I think it's pretty straightforward and pretty clear, and that simply is, did plaintiffs have enough evidence to survive summary judgment? And to my mind, plaintiffs did. And I'd like to illustrate that briefly, very briefly, by reference to two declarations that the plaintiffs put into evidence in opposition to the summary judgment motion. One was the declaration of Jay Carsman, who is a high-level city Department of Transportation administrator with firsthand knowledge. You know, we put him in as a example to the four or five dollar increases in the initial fine up through 2008, that they were adopted solely to raise revenue for the city's general fund, not for co-chair on two of the groups in Mayor Eric Garcetti's parking reform working group. As to Mr. Bieber's group, they focused on parking meter enforcement, as well as on parking meter protocols and parking enforcement policies more generally. Anyway, and I can give the court sites to each of these declarations if that's needed. As to Mr. Bieber, in his declaration, he agrees with Mr. Carsman on the points that I just referenced. And he added that the city does not look at the minimal nature of the offense in setting the amount of meter fines, and instead it sets its fines as high or even higher than serious safety parking violations. But how, even assuming that we looked at that as relevant to the legal issue, how does that establish gross disproportionality with regard to the city making a determination that on its streets it wants to make sure that parking laws are enforced, that people don't overstay, that it cuts back on traffic congestion? I mean, how does that affect the gross disproportionality of the $63? Why isn't the city's legislative branch entitled to make these kind of determinations for a number that clearly, to me at least, doesn't shock the conscience? Well, I don't think the standard has shocked the conscience. I think that's a different due process standard. But the standards gross disproportionality, and I think the plaintiffs were entitled to put in evidence that when the city set these fine amounts, that they had considerations other than those that you've just cited. Judge Bennett, for example, just increasing general revenue. All those factors go into the mix. And it's, you know, maybe at trial the judge ultimately will not be convinced that it's grossly disproportional, but we're here on summary judgment. And we put lots of facts in that we think are relevant. And the way the summary judgment rules work is the plaintiffs are entitled to have all of that considered. But it seems like you're almost asking for a strict scrutiny type narrowly tailored means requirement here with respect to the fine issue here. And how do we, what do we do with the Supreme Court's direction from the, you know, the Bajaj Kajian case where it says we have to be very deferential to the legislature's determination of a fine? You know, it seems like you're asking that there has to be some very tightly, narrowly tailored connection between the two. But it seems like we have to apply a very deferential standard. Well, I agree the standard's deferential. That's gross disproportionality. But I do think the courts have an obligation to look at the factors that, you know, the Ninth Circuit has set forth are relevant and the Supreme Court case you just cited, Judge Lee, and go through those and weigh them, giving, you know, deference to the legislative determination. But look at all the aspects of it and we think when you look at all the factors we introduced that an inference can be drawn that it's grossly disproportional. And the court didn't do that below. The court, for example, looked at these declarations that I just referenced and said, well, nothing they say matters and I'm not going to change my opinion or consider them. I don't think that's how it works. I think the court has to consider the evidence if it's relevant and the sorts of things I'm citing are relevant. So this would be the case, let's say, I mean, I think that the evidence was that this number hadn't gone up since 2012, but I might have the year wrong. Santa was $63 plus fees if you don't pay. So if it was $30 but you had the same evidence, you had the same declarations, there'd have to be a trial if it was 30 instead of 63? Well, first, I mean, we sued way back in February 2014, so it wasn't very long after 2012. And it may be, you know, when we look at it in 2020, if there's a trial, we're going to come to a different conclusion than we came to when we filed the case. But we still got those years of overcharges regardless of the passage of time. But, you know, there's other factors. No, but my question is, if you had put in the same types of declarations but the number was 30 instead of 63, in your view, the law would still require there to be a trial? If the fine was 30? Yeah, but your declarations had the same types of things in them that you say with regard to 63 establishes disputed issues of fact. It wouldn't really matter what the number was, that if you have these kinds of declarations, you get a trial on whether it's an excessive fine? Oh, no, that's not our position at all. In fact, I think we concede that a certain amount of the fine would pass constitutional muster quite clearly. 30, we wouldn't challenge that. So 30 would be okay, 63 isn't because of your declarations, but it ought to be us that makes that determination, not the L.A. City Council. Well, in this case, if we have sufficient evidence to cast in doubt the constitutionality of what they're doing and we think we do, we're entitled to a trial. Yes, that's our position. Can you clarify one thing? You have brought this as a facial challenge, right? You are just saying that nobody, I mean, this is unconstitutionalized to everybody. Is that right? Well, you know, we're not here to discuss the class action. We're here to discuss the specific. I'm just asking you, are you bringing this as a facial challenge? Yes or no? Just tell me that. I find that hard to answer, frankly, in this context. Why? Because, well, we explained it, I think, in the brief, but I think it as to it's as applied to everybody. It's kind of, you know, it's kind of right. It's not it's not mean specific. You say it's it's grossly disproportional no matter who's the who the payer is. Some portion of it, not that we're not trying to throw out the whole. You say anything over forty dollars, forty dollars for parking meter violation is unconstitutional. That's what that's your position. OK, but that's true as to everybody. Even if I have I'm a billionaire, it's forty dollars is too much for me to pay. That's your position, right? That's our position. Yeah. OK. And, you know, I haven't even mentioned the factors, you know, the elephant in the room to us, which is poor people are very much affected by this. That's why I was asking the question. It seems to me there might be a different as applied analysis that could come into play. But you have not. I read your class definition and it was not in any way geared toward how much somebody could afford to pay. It was just across the board. It's on everybody who paid this particular amount you think is entitled to really. Right. But we also allege that it's particularly oppressive as the poor people. But that's not it's irrelevant to the analysis you're asking us to conduct because you frame this as a facial challenge. That's how that's why I put the question to you. I don't have a subclass maybe composed of people who lack the means to pay. That would be different. Right. I don't think it's irrelevant because, for example, if there's a trial, the two individual plaintiffs that we represent who are not poor, maybe the court would conclude it's not grossly disproportionate. But if they had brought an as applied challenge, yeah, but you didn't do that. You brought only a facial challenge as I read your complaint. Is that not a fair reading of it? That's why I asked the question. No, that's not the intent of our allegations. And that's why we mentioned in there that the effect on poor residents, poor persons. OK, so you have run out of time, but we'll give you a couple of minutes for rebuttal. Why don't we hear from the city first? We should. May it please the court. Gerald Sato for the city of Los Angeles. Could you start by addressing a question that I don't think your opponent raised, but I'm concerned about. And it's the separate 100 percent penalty for nonpayment within, what is it, 30 or 40 days? Well, I guess there is no separate analysis, I think, by the district court of that question. There's none in your brief. I guess I find it seems to me there's an entirely different question as to whether that penalty is grossly disproportionate to whatever harm the city might have suffered by the violators failure to pay within the city. And I guess I'd like to hear you address that as a separate matter. Well, first, I think sometime earlier in the case, the focus of the district court and the parties was going to be on the size of the first fine, primary fine. There was discussion, I think we both discussed this case out of the Providence, Rhode Island case, in which there was a penalty that, unlike the city of Los Angeles, which is there's a one-time doubling of the fine, the penalty in Providence could have gone on forever. I think the original fine was $30-something. And then by the time the case got to trial with the penalties, it was several thousand dollars. So there is a limit. And I think the I'm not sure that the well, I'll put it this way. I mean, I'm assuming that the grossly disproportional standard would apply to both the basic fine and the penalty. Should there be a separate analysis of the gross disproportionality of the penalty? Because it's proportionate to what? I think it's to the underlying harm of the city not getting the money within the 30. How many days is it, 30, 40? I'm sorry. I've forgotten the exact. But it is. It's not immediate. Right. I would also emphasize that the penalty is there not because the city is hoping people will mess up their payments and have to pay the penalty. It's there to encourage timely payment. And that's important because an order, administrative order, that becomes final, that a fine has to be paid. My question, sir, my question is simply this. There was no separate analysis, no separate Eighth Amendment analysis by the district court of the penalty. And all I'm asking, I think, to you is, and you failed to engage in any separate analysis in your brief. Doesn't there need to be some kind of a separate analysis of whether the $63 penalty that's being imposed against you for not paying the money within 30 or 40 days, whether that's grossly disproportionate to whatever underlying harm the city is suffering by not getting the money within that time period? I didn't, I guess we didn't understand the plaintiffs to be sort of making that broad of an argument. So I don't think it was error for the district court to not have addressed it or for really either of us to have addressed it in any detail. I think our argument would still be that whether we're looking at $63 or 126 with these other fees, that there's not a gross disproportionality. Gross disproportionality analysis apply if you compare what the fine is to the particular offense. But the penalty, I'm sorry. So the appellant has a separate section in their brief entitled, the late penalties and collection fee in context are sufficiently facially disproportionate to likewise warrant a trial. And your brief doesn't address that argument at all. And although the court, the district court addresses this issue very briefly in a footnote, does not appear to have conducted a separate disproportionality analysis. So given that it was raised that the district court didn't separately address it in detail and that you haven't addressed it at all in your brief, why shouldn't we remand that question to the district court to look at separately? The excessive fines analysis compares the fine to the, it cannot be grossly disproportionate to the offense. But when we're talking about a penalty for nonpayment, it's not, the penalty is there not for the offense. It's because the amount has, the fine, the $63 has not been paid. But then isn't 100% of a late fee disproportionate to the offense of paying late? I mean, 100% late fee, I mean, the loan shark would blush at that kind of return rate. I mean, doesn't that, if anything, make it more grossly disproportionate if it's tied to being late by 21 days? Well, again, the purpose of the late fee is not to collect more money on top of the fine. It's to encourage timely payment. We, the city, I mean, sets up payment plans for when an order becomes final and if there's going to be difficulty in paying that. But, no, I mean, we didn't address that as a separate issue. And I guess I've sort of given you my reasons for why I didn't anyway. Did the city ever argue that because these are the city's streets that the analysis of what the city can charge for overparking or not paying a fine on its streets is not subject to an excessive fines clause analysis at all? We didn't make that argument because we understood case law to say whether a financial payment required is labeled civil or criminal. If one of the purposes of that amount is deterrence, then excessive fines analysis applies. And our position has been, well, yes, the civil penalty, the $63, is met at least in part to deter future parking violations. And I think the district court's finding that that is so, I think, is supported by the evidence. I don't think there's evidence to contradict that. So I think excessive fines analysis is the correct approach in this case. I did want to make one point about the expert witnesses. We had the professor, I think, of urban affairs and Chicano studies professor and the CPA. They tried to compare the city's fines, that structure, to sort of different kinds of objective standards. There's a labor analysis. There's different kinds of things that they looked at. But I'd submit that that might have some relevance if the standard was not gross proportionality but strict proportionality to some kind of objective standard. And in any event, those two experts didn't opine one way or the other, whether the city's fine or penalty amounted to gross disproportionality compared to the offense. And the other expert witness, Mr. Bieber, he's not required to register as a lobbyist, but that is what he does. And also his analysis was very much a kind of strict proportionality kind of argument. That is, you can make generalizations about residents in the city of Los Angeles and bases his argument about $40 or less than $40 on that. But that is not what I understand, what I think the courts understand to be the gross proportionality standard. I was going to make a point about whether this is a facial or as-applied challenge. I think the court's comments about that and what we've said about it in our briefs, I don't know that there's anything more I could add to that. If there's anything else, I'd be happy to answer the court's question. Happy may be a stretch, but... It looks like we don't have any other questions. Thank you very much for your argument. Thank you very kindly. Why don't we put two minutes on the clock for rebuttal, if you'd like. Well, I'd like to come back to the question about whether we're suggesting the standards, the court should engage in strict scrutiny of what the city does in terms of the fine amounts. That's not the standard we've proposed. I don't think you'll find that anywhere in our briefs. What we're saying is what the Ninth Circuit has said in excessive force cases, which is the court must make a searching inquiry of the fine, of the penalty, and take into account certain basic aspects of the inquiry, such as how serious is the crime, the offense, et cetera, but should take into account other matters that bear on the inquiry. And that's the standard we've proposed here, or are proposing. Let's just go back to these two declarations of the experts, because Mr. Sato addressed them. The city didn't even bother to put in declarations disputing what they said on the summary judgment motion. So they were unchallenged, and they said, look, these fines are set arbitrarily. What kind of deference should we give the city council when they do set these fines arbitrarily? They set them to raise revenue to the general fund, not to deter violators, et cetera. What kind of deference is the city council entitled to in that context, in those circumstances? And that's our argument. We don't think very much. But bottom line is that we put enough in there, there's enough factors in this mix, and enough questions, and enough very dubious aspects of what the city is doing in terms of arbitrariness, setting the fines for parking meter violations as high as safety violations, safety parking violations. They're not proceeding in a manner that really requires, you know, a great bit of deference in this particular factual context. And we're saying to really sort this out, we need a plenary trial. That's really what we're saying. I'll just close on this. You know, there's something rotten in the city of L.A. When you look, for example, at the city of Glendale and the city of Pasadena, and you take the initial fine and the initial late penalty, L.A. City is $52 higher than the city of Pasadena on that, and $34 higher than the city of Glendale. It just doesn't smell right, and we think we have enough along these lines to get the trial. So that's our position, basically. Okay. Thank you, counsel. Thank you very much. Case to start, you have submitted.
judges: Watford, Bennett, Lee